UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SERRINA JACKSON, | : | Case No. 2:21-CV-00574-EAS |
| | : | |
| Plaintiff, | : | Judge Edmund A. Sargus |
| | : | Magistrate Kimberly A. Jolson |
| vs. | : | |
| | : | |
| JOE RICHARD, et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## PLAINTIFF'S MEMORANDUM CONTRA DEFENDANT CITY OF COLUMBUS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through the undersigned counsel, respectfully moves this Court to deny

Defendant City of Columbus' Motion for Summary Judgment. A Memorandum in Support is

attached hereto.


Respectfully submitted,

/s/ Kirstin A. Peterson
Kirstin A. Peterson (0099040)
John K. Fitch (0008119)
The Fitch Law Firm, LLC
900 Michigan Avenue
Columbus, OH 43215
614.545.3930; 614.545.3929 – Fax
Kirstin@thefitchlawfirm.com
John@thefitchlawfirm.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.      Introduction …………………………………………………………….. 6

II.     Statement of Facts ……………………………………………………… 6

        A.      Background ……………………………………………………… 6

        B.      Deposition Testimony ………………………………………...… 9

                1.      Aja Farris …………………………………………………… 9

                2.      Rebecca Diehm …………………………………………….. 10

                3.      Julie Dassylva …………………………………………….… 11

                4.      Sundeepti Jindal …………………………………………….. 13

                5.      Tiffany Thomas …………………………………………….. 13

                6.      Holley Fannin …………………………………………….… 14

                7.      Kylie Salvadore …………………………………………....15

                8.      Zachary Bridges …………………………………………… 16

III.    Law and Argument ……………………………………………………...18

        A.      Summary Judgment Standard ……………………………………18

        B.      Claims Pursuant to Title VII and R.C. 4112.02 ........................................ 19

        *There is a genuine dispute as to material fact with respect to Plaintiff's sexual harassment claims, and, therefore, summary judgment is inappropriate.*

                1.      Supervisor Harassment ................................................................ 20

        *The evidence establishes a genuine dispute as to whether Richard was Plaintiff's supervisor. Additionally, there is a genuine dispute as to whether the City had an effective harassment policy and whether the harassment policy was enforced. Finally, Plaintiff's failure to use the complaint procedure was not unreasonable. The City is not able to establish an affirmative defense.*

                2.      Co-Worker Harassment ................................................................ 24

        *Richard was a known serial harasser. Moreover, the City's actions and/or inactions demonstrated negligence.*

        C.      Negligent Supervision and Retention ........................................................ 25

        *There is a genuine dispute as to material fact with respect to Plaintiff's claim for negligent supervision and retention and therefore, summary judgment is inappropriate.*

1.      Existence of an Employment Relationship ..................................... 26

There is no dispute that Richard was employed the City at all relevant times hereto.

2.      Employee's Incompetence .............................................................. 26

Richard's sexually harassing behavior is incompetence under the law.

3.      Employer's Actual or Constructive Knowledge of Incompetence .. 26

The City had actual knowledge of Richard's incompetence or, at the very least, constructive knowledge of his incompetence.

4.      Employee's Act or Omission Causing Plaintiff's Injury ................ 28

The harassment and assault that Plaintiff suffered at the hands of Richard was a proximate cause of her harm.

5.      Employer's Negligence in Hiring or Retaining Employee was Proximate
        Cause of Plaintiff's Injury ............................................................... 28

But for Richard's employment with the City, there is no evidence Plaintiff would have ever met Richard, and the harassment and assault would have never occurred.

6.      Sexual Assault ................................................................................ 28

Based upon the number of women harassed by Richard within a relatively short period of time, the City could have anticipated Richard's acts would escalate into criminal misconduct.

D.      Respondeat Superior ..................................................................... 29

There is a genuine dispute as to material fact with respect to Plaintiff's claim for respondeat superior and, therefore, summary judgment is inappropriate.

E.      Intentional Infliction of Emotional Distress .................................. 31

There is a genuine dispute as to material fact with respect to Plaintiff's claim for intentional infliction of emotional distress and, therefore, summary judgment is inappropriate.

F.      Negligent Infliction of Emotional Distress ................................... 33

Plaintiff is not pursuing a claim for negligent infliction of emotional distress.

IV.     Conclusion ………………………………………………………….... 33

V.      Certificate of Service …………………………………………….…..... 34

# **TABLE OF AUTHORITIES**

## Cases

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) .................................................. 19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................. 19

*Auer v. Paliath*, 140 Ohio St.3d 276, 281 (2014) ..................................................... 31

*Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584 (1991) ........................................ 29

*Childs v. Charske*, 129 Ohio Misc.2d 50, 57, 822 N.E.2d 853, 2004-Ohio-7331 ...... 27

*Clark v. UPS*, 400 F.3d 341 (6th Cir. 2005) ............................................................. 22

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .......................................................... 18

*Dresher v. Burt,* 75 Ohio St.3d 280, 662 N.E.2d 264 (1996) .................................... 18

*Evans v. Ohio State Univ.,* 112 Ohio App.3d 724, 680 N.E.2d 161, (1996) ........... 26, 28

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) .................................... 21, 22, 24

*Federal Steel & Wire Corp. v. Ruhlin Constr. Co.,* 45 Ohio St.3d 171
   543 N.E.2d 769 (1989) ...................................................................................... 29

*Fleenor v. Hewitt Soap Co.*, 81 F.3d 48 (6th Cir. 1996) ........................................... 20

*Fry v. Wheatland Tube*, LLC, 2019-Ohio-1453 (5th Dist. 2019) ............................... 26

*Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 740 (2000) ..................... 32

*Hawkins v. Anheuser-Busch, Inc.* 517 F.3d 321 (6th Cir. 2008) .......................... 24, 25

*Johnson v. Cox*, 1997 Ohio App. LEXIS 1346 (4th Dist. 1997) ............................... 32

*Kerans v. Porter Paint Co*.., 61 Ohio St.3d 486 (1991) ............................................. 29

*Laderach v. U-Haul*, 207 F.3d 825 (6th Cir. 2000) ................................................... 19

*Lipps v. Kash*, 2008-Ohio-2628 (12th Dist. 2008) ............................................... 29, 30

*March v. Steed Enterprises, Inc.* 5th Dist. Muskingum No. CT2012-0058
   2013-Ohio-4448 ................................................................................................ 29

*Mary M. v. Los Angeles* (1991), 54 Cal.3d 202, Cal.Rptr. 99, 814 P.2d 1341 ......... 30

*Morningstar v. Circleville Fire & EMS Dep't,* 2018 U.S. Dist. LEXIS 43134
   (S.D. Ohio Mar. 16, 2018) ................................................................................ 32

*Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138 ..................... 19

*Osborne v. Douglas,* 2013-Ohio-5072 (6th Dist. 2013) ............................................ 31

*Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825 (1993) .................................. 30

*Patidar v. Tri-State Renovations, Inc.*, 2006-Ohio-4631 (10th Dist. 2006) .............. 30

*Paugh v. Hanks*, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983) .................................. 31

*Rabidue v. Osceola Refining*, Co., 805 F.2d 611 (6th Cir. 1986) .............................. 20

*Ross v. Campell Soup Co.*, 237 F.3d 701 (6th Cir. 2001) .......................................... 19

*Saunders v. McFaul*, 716 Ohio App.3d 48, 593 N.E.2d 24 (1990) ........................... 19

*Simpkins v. Grace Brethren Church of Del.*, 2014-Ohio-3465, (5th Dist. 2014) ....... 29, 30

*Stephens v. A-Able Rents Co*., 101 Ohio App.3d 20 (1995) .......................... 19, 28, 30

*Thornton v. Fed Express Corp.*, 530 F.3d 451 (6th Cir. 2008) .................................. 22

*Vance v. Ball State University,* 570 U.S. 421 (2013) ............................................ 20, 24

*White v. Ohio Dep't. of Rehab. And Corr.*, 2005-Ohio-5063
   (Ohio Ct. Cl., Dec. 22, 2005) ........................................................................... 26

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................ 18

**Statutes**

42 U.S.C. § 2000e-2(a)(1) ............................................................................... 19

42 U.S.C. § 2000(e)-2 ..................................................................................... 19

Ohio Rev. Code § 4112.02(A) ......................................................................... 19

**Treatises**

Elizabeth Jubin-Fujiwara & Joyce M. Brown, *Causes of Action for*
    *Post-Ellerth/Faragher Title VII Employment Sexual Harassment*
    *Claims*, § 53, (2008), available at 27 COA2d 1 (Westlaw) ..............................................24

<u>**MEMORANDUM IN SUPPORT**</u>

## I.     <u>Introduction</u>

On October 28, 2021, Defendant City of Columbus, which also encompasses the Columbus Division of Fire, (hereafter, collectively, "the City") filed a Motion for Summary Judgment with respect to the claims asserted against them by Plaintiff Serrina Jackson ("Plaintiff"). Viewing the evidence in the light most favorable to Plaintiff, the City is unable to meet the high burden of proof for summary judgment. Consequently, the Motion for Summary Judgment must be overruled on all claims.

## II.     <u>Statement of Facts</u>

### A.     <u>Background</u>

In its' Motion for Summary Judgment, the City fails to include important facts that have significant bearing on this case and show that this dispute is not just between Plaintiff and Defendant Joe Richard ("Richard"). On April 8, 2019, Plaintiff began her employment with the City as a Cadet in the City's Cadet program through the Division of Fire. Jackson Dep., ECF No. 32 at 17. Per the City, the Cadet program "is an initiative aimed at increasing diversity and inclusion within the Division. Cadets…..learn[ing] about the *paramilitary organizational structure* of most fire departments..." Motion for Summary Judgment, ECF No. 19 at 2 (emphasis added).

At the time Plaintiff was hired by the City, Richard was a Battalion Chief with the Division of Fire. Richard Dep., ECF No. 34 at 11. Richard had been with the City for approximately 35 years. Jackson Dep., ECF No. 32 at 28; Richard Dep., ECF No. 34 at 9. Within the paramilitary structure of the Division of Fire, a battalion chief holds a high ranking. The rankings, from highest to lowest, are as follows: chief, assistant chief, deputy chief, battalion chief, captain, lieutenant, and firefighter. Richard Dep., ECF No. 34 at 45-46. If someone gives an order to someone below

them in rank, that person is required to follow said order. *Id.* at 46-47. Someone within the cadet program would take orders from someone with rank. Salvadore Dep., ECF No. 35 at 32-33.

In February or March of 2019, prior to Plaintiff officially beginning the cadet program, she experienced her first instance of sexual harassment. Plaintiff had scheduled a meeting with a City HR representative to complete paperwork required for the cadet program. Jackson Dep., ECF No. 32 at 148. As she sat in a waiting room at the fire department with her daughter, Richard came in the room and acted like a leg of the table she was sitting at was loose. *Id.* at 147-49. Richard got under the table, at which time Plaintiff noticed he was looking up her dress, something her daughter noticed as well. *Id.* at 13-14; 17; 147.

Between this first instance in February or March of 2019 and October of 2019, Plaintiff experienced repeated instances of sexual harassment at the hands of Richard including, but not limited to, the following: asking her for oral and vaginal sex (*Id.* at 17;); following her to a convenience store (*Id.* at 169-70); making inappropriate comments about Plaintiff's weight, makeup, and clothing (*Id.* at 19); and requesting that Plaintiff download an app entitled "Marco Polo" in order to send him inappropriate, sexual videos. *Id.* at 30. Moreover, Richard often made statements to Plaintiff like, "You walk like you have a wet pussy" (*Id.* at 21); "What are your desires?" *(Id.)*; and "I want your lips." *Id.*

While these acts alone are disturbing, the most egregious acts by Richard occurred on May 15, 2019. Richard called the cadet office and requested to see Plaintiff about her performance. Salvadore Dep., ECF No. 35 at 42-43. Plaintiff was in Richard's office on at least two occasions on this day. Jackson Dep., ECF No. 32 at 25-26. (Testimony has shown that Plaintiff was in Richard's office three times on May 15, 2019, but the last two instances are sometimes grouped together as one occasion. For purposes of this Motion, the last two instances will be group together

as the last occasion). Richard dismissed the cadet leader who had brought Plaintiff over, subsequently leaving he and Plaintiff in the room alone. Richard Dep., ECF No. 34 at 131. During this last occasion, Richard spoke to Plaintiff's doctor regarding her knee injury, which had been affecting her in the cadet program. Jackson Dep., ECF No., 32 at 98; 159. Following this discussion, Richard prompted Plaintiff to tell her lieutenant that she lied about being dyslexic. *Id.* at 98. Plaintiff was subsequently written up for dishonestly. *Id.*

Following this interaction with her lieutenant, Richard escorted Plaintiff back to his office. *Id.* at 98. He told her "…you really outdid yourself now. They're really tired of you now. They're probably really going to fire you." *Id.* at 98-99. Richard then proceeded to ask Plaintiff to do a thruster. *Id.* at 99. He told Plaintiff to pull her pants off, and he also assisted her in doing so, and told her to walk over to the window. *Id.* at 99-100; 122-23. Richard grabbed a chair, sat behind her, and told her to do a thruster. *Id.* at 123. As Plaintiff was performing the thruster, Richard grabbed her vagina and sexually assaulted her by putting his finger up Plaintiff's vagina. *Id.* at 102; 195. Multiple times on May 15, 2019, Richard told Plaintiff that if she didn't take her pants off, he could get her fired. *Id.* at 103; 123; 129. Richard admitted to criminal investigators to Plaintiff being in his office without pants. Richard Dep., ECF No. 34 at 163-64. Richard disputes most of the factual history set forth thus far, although he admitted to having phone conversations with Plaintiff regarding sex. (*Id.* at 173).

The City claims it had no notice of any harassment allegations until the allegations of Aja Farris and Rebecca Diehm were reported in October of 2019. Motion for Summary Judgment, ECF No. 19 at 2-3. However, evidence shows that the City had knowledge of Richard's propensity to harass female employees of the City, yet did nothing. The Division of Fire, and the City in general, chose to ignore Richard's harassing behaviors instead of taking action.

## B.  **Deposition Testimony**

### 1.  *Aja Farris*

Firefighter Aja Farris (hereafter, "Farris") started training with the Division of Fire in 2010. Farris Dep., ECF No. 31 at 10. She first had an uncomfortable experience with Richard in 2013 when he was lieutenant. *Id.* at 26. On January 28, 2019, Farris began in the recruitment department. *Id.* at 12. On her first day in recruitment, Farris observed Richard undressing her with his eyes, looking her up and down, and licking his lips. *Id.* at 24-25. She testified that another firefighter, Lamar Ruffin (hereafter, "Ruffin") was there when this occurred. *Id.* at 25.

The harassment did not end here. On February 19, 2019, Farris attended a retirement party for a co-worker. *Id.* at 28. When she walked into the party, she walked past Richard, who stated, "Damn, Aja, girl. Hmm, hmm, hmm." *Id.* at 24-25. She testified that she felt disrespected and that he was being inappropriate. *Id.* at 25. She also testified that numerous people witnessed this: she was with another female firefighter, Liz Finnegan, and there were also other men from the fire department standing with Richard. *Id.* at 24. Farris spoke to Ruffin and Julie Dassylva (hereafter, "Dassylva") about this incident after it occurred. *Id.* at 30.

Farris further testified that she told her lieutenant, Zachary Bridges ("Lt. Bridges"), that she was uncomfortable around Richard, and Lt. Bridges subsequently made accommodations for her. *Id.* at 30. She told Lt. Bridges that a lot of Richard's comments were inappropriate, she felt like he undressed her with his eyes, and he always had some sort of sexual connotation behind his statements. *Id.* at 31-32. The accommodations Lt. Bridges provided included trying to make it so that Farris was never alone with Richard. *Id.* at 30-31. She testified that she first reported her issues to Lt. Bridges in late January of 2019 or early February of 2019 and that she spoke to Lt. Bridges approximately 10 times regarding Richard making her uncomfortable. *Id.* at 31-32. She stated,

"…he [Lt. Bridges] sent me messages, you know, checking on me to ask, am I okay, because there were times I had to be alone with him. He was very much aware that I was uncomfortable with our chief at that time." *Id.* at 32.

Another incident occurred in a meeting with Farris, Lt. Bridges, Ruffin, and Richard in September 2019. *Id.* at 35. The former three entered Richard's office and observed him watching television, and he made a comment about an athlete along the lines of "I can only imagine how many women he's going to have in his bedroom." *Id.* at 35. Farris further testified that, "He [Richard] just didn't care that he was in a professional setting. And sarcasm and sexual comments were normal for him. And it started to become normal for everybody else, sadly." *Id.* at 36.

After the October 1, 2019 incident occurred (*see* Dep. of Aja Farris, ECF No. 31 at p. 42-49) and Richard was finally investigated, Farris stated that Lt. Bridges apologized to her on multiple occasions. *Id.* at 39. These apologies included asking her if she thinks he should have said something sooner. *Id.* at 39-40. She testified that Lt. Bridges often made excuses for Richard. *Id.* at 40. From the moment she started working, her co-workers tried to brief her on Richard's inappropriate comments. *Id.* at 76-77. In fact, many people within the City seemed to make excuses for Richard or otherwise brush off his actions. When Farris was discussing with Ruffin Richard's request that every woman brought through the recruitment doors should be brought to his office before they leave, Farris stated this was inappropriate, and Ruffin responded with, "Well, he's the fire chief." *Id.* at 38.

2. *Rebecca Diehm*

Rebecca Diehm (hereafter, "Diehm") began her employment with the City on June 6, 2016. Diehm Dep., ECF No. 29 at 8. At all times relevant hereto, she was employed as an Assistant to Public Information Officer. *Id.* at 9. Diehm worked with the recruiting office on things like

recruiting materials and brochures. *Id.* at 10. Diehm first met Richard in the summer of 2018. *Id.* at 12. The harassment started two or three months after she met Richard (*Id.* at 33-34), possibly putting the beginning of the harassment by Richard in the fall or winter of 2018. Some examples consist of asking her out on dates and commenting on her appearance. *Id.* at 23-24.

Perhaps the most egregious harassment occurred in late 2019. *Id.* at 14-15. Diehm entered Richard's office to ask him his opinion on something work-related. *Id.* at 15. She wanted to make sure his door was open because past conversations with Richard had made her uncomfortable. *Id.* at 15-16. When she kneeled by Richard at his desk, Richard grabbed his phone, put it in his left hand, and proceeded to go behind her back with is phone. *Id.* at 16. Diehm felt her dress move and, when Richard pulled his phone back up, she noticed it was on "selfie mode on the front-facing camera." *Id.* at 16. She discussed this incident with Ruffin and Lt. Bridges not long after it occurred. *Id.* at 18-19. In this conversation, Diehm stated that Lt. Bridges told her, "…I mean, I can see both sides of it, like the picture side and the timer live voice recording side…I have heard from multiple women…that he gives off that vibe." *Id.* at 22-23; *see also* Richard Dep., Ex. 2D.

When questioned why she did not tell anyone about Richard's harassment prior to the cell phone incident, Diehm stated, "There's a fear. He was supposed to be my boss. That's just how – in Fire, you don't know, you don't know who will be put in the position that is your boss or higher than that, so there's just a level of fear there." Diehm Dep., ECF No. 29 at 25.

### 3. Julie Dassylva

Julie Dassylva ("Dassylva") was hired by the Division of Fire in 2001. Dassylva Dep., ECF No. 28 at 8. In 2019, she was a recruiter within the fire department. *Id.* at 9. Dassylva testified about a particular incident in a group setting in Richard's office where he stated he was recruiting candidates in the YMCA steam room. *Id.* at 13. Lt. Bridges, Jen Miller, Ruffin, and Dassylva were

all in Richard's office when he made these comments. *Id.* at 13. After this incident occurred, she discussed it with Jen Miller, Ruffin, Farris, and Lt. Bridges. *Id.* 14-15. She stated there was general uncomfortableness that everybody had experienced with respect to these comments. *Id.* at 15.

Dassylva further testified regarding an incident in May of 2019 where Richard flagged her over in the parking lot. *Id.* at 15-17. Richard stated, "How can I get me some of that recruitment T-shirt" while glaring at her chest. *Id.* at 16. Dassylva stated that she believed Richard did not actually want one of the t-shirts and was referring to her breasts. *Id.* at 16. She also testified that Richard followed this statement with "I'd probably get in trouble for that." *Id.* at 16-17. Dassylva testified that Richard often used qualifying statements like this one before or after making inappropriate or uncomfortable statements. *Id.* at 17. She also stated that she witnessed Richard using one of these disclaimers in front of Lt. Bridges. *Id.* at 35.

Dassylva further testified about the unwritten rule with respect to Farris and Richard. This unwritten rule, touched upon earlier, was that if anybody saw Farris alone with Richard, they should intervene. *Id.* at 29. She further stated this unwritten rule began when Farris arrived to recruitment. *Id.* at 30. Moreover, Dassylva stated she discussed this unwritten rule with Lt. Bridges and that he was aware of it. *Id.* Dassylva further testified that the recruitment staff talked about how inappropriate and concerned they were because of Richard's behavior. *Id.* at 30-31. The recruitment staff, including Lt. Bridges, was concerned if Richard was interacting with female candidates. *Id.* at 31. Dassylva testified that Lt. Bridges was aware of inappropriate behavior by Richard because they had discussed it. *Id.* at 41.

Dassylva also testified that she had a conversation with then-Firefighter Kylie Salvadore, now lieutenant, about Lt. Salvador being uncomfortable when she was dismissed by Richard and asked to shut the door after bringing Plaintiff to meet with Richard. *Id.* at 31-34. Dassylva estimates

this incident occurred after Plaintiff was in Richard's office and before she went on injury leave around July 2019. *Id.* at 33-34.

### 4.    Sundeepti Jindal

Sundeepti Jindal ("Jindal") was employed with the City of Columbus, Mayor's Office, beginning in February 2019. Jindal Dep., ECF No. 33 at 8-9. She worked alongside Richard on the Harvard Bloomberg Project. *Id.* at 11-12. By way of background, the Harvard Bloomberg Project or Study was an initiative aimed at improving diversity. Bridges Dep., ECF No. 27 at 25-26. Around April of 2019, following a focus group, Richard, unprompted, walked Jindal to her car. *Id.* at 16; *see also* Richard Dep. Ex. 2C. He asked her if she had a boyfriend, to which she replied no. *Id.* at 16-18; *see also* Richard Dep. Ex. 2C. Richard then asked her if she was a virgin. *Id.* at 19. He continued by asking the ethnicity of men she had been with, inquired about her mom, and asked her if everything on her body was real. *Id.*

On another occasion, Jindal had planned to go to see the Firefighter Mile. *Id.* at 25. Richard told her, when she comes to see the Firefighter Mile, not to wear her work clothes and not to "dress like all sexy". *Id.* at 26. She told her co-worker, Doug Murray, about this interaction. *Id.* at 28-29. She did not end up going to the Firefighter Mile due to her conversation with Richard. *Id.* at 27. Among the reasons Jindal testified that she did not report Richard to anyone within the Mayor's Office or to anyone else within the City, outside of Doug Murray, was because she was new and "…wasn't trying to start anything…". *Id.* at 41-42.

### 5.    Tiffany Thomas

Tiffany Thomas ("Thomas"), like Plaintiff, began the Cadet program with the City on April 8, 2019. Thomas Dep., ECF No. 36 at 10. She testified, between April and May of 2019, that she met with Richard approximately three or four times, always during the cadet program. *Id.* at 17;

40. Richard would instruct one of her instructors to bring her down to his office. *Id.* at 18-19. During these meetings, he would talk with her about the cadet program. *Id.* at 17. He also told her that some of the staff wanted to fire a particular cadet (Plaintiff), and it was his desire to advocate for that cadet. *Id.* at 17-18. He told her he had concerns for Plaintiff's performance and wanted to assist her and help her in any way. *Id.* at 28. He wanted Thomas to get close to her, find out personal information, like her family life, and report back to him. *Id.* at 28-29. He also told Thomas that instructors of the cadet program were actively trying to get Plaintiff expelled from the program. *Id.* at 30. Thomas testified that she had thought Richard had duties with respect to the cadet program. *Id.* at 14.

In addition to the above, Richard made inappropriate statements to Thomas like "are you dressed like that for me?" (*Id.* at 20), inviting her to dinner (*Id.* at 22-25); and telling her that he thought he loved her (*Id.* at 25-26). She testified that Richard never spoke to her about the Bloomberg Study, and she does not know what that study is. *Id.* at 30.

Thomas further stated she spoke to Instructor Echols once in April or early May (presumably of 2019) about how verbose Richard is. *Id.* at 32-33.

### 6.    *Holley Fannin*

Holley Fannin ("Fannin") has been employed by the City Department of Public Safety since 2018 as a human resource analyst. Fannin Dep., ECF No. 30 at 8-9. Fannin testified that she worked closely with the recruitment department of the fire department with respect to the hiring and interviewing process for the cadet program. *Id.* at 11.

In a March 2019 meeting regarding the cadet program with Fannin, Richard, and Lt. Bridges, Richard asked Fannin if her husband was white or black. *Id.* at 14-15. Another incident occurred between May 30, 2019 and July 11, 2019 where Richard told her that he would leave his

wife for her if she had red in her hair. *Id.* at 19-21. Fannin discussed this conversation with Lt. Sexton Towns a couple minutes after it occurred. *Id.* at 21. She also confronted Richard after he made this statement and told him, "You need to be careful about what you say to women because it can easily be perceived as something you may not want it to be…Comments like this can be considered harassment, and at the end of the day they are just unprofessional and inappropriate…" *Id.* at 22-23. She also testified that Richard told her between 15-20 times that she was pretty. *Id.* at 17.

### 7. *Kylie Salvadore*

Kylie Salvadore ("Salvadore") joined the Division of Fire in 2008. Salvadore Dep., ECF No. 35 at 10. In 2019, she was an instructor for the cadet program. *Id.* at 13-14. She testified that, with respect to the cadet program, recruitment was "in and out of what the cadets did" although she later stated recruitment was not over the cadet program. *Id.* at 16-18. She also stated that Richard had involvement with the cadet program; for example, asking her how cadets were doing or requesting she bring cadets down to him. *Id.* at 22-23. Furthermore, "…he was not over my chain of command. However, he is a battalion chief. If he ordered me to do something, I guess, I didn't question or would not question what he asked me to do as far as that goes." *Id.* at 24. She felt she had no choice but to comply with Richard's requests. *Id.* at 32. She also testified that Richard never explicitly told her he was pulling cadets for the Bloomberg Study. *Id.* at 25. At one point, Salvadore spoke with Lt. Sexton Towns about Richard pulling cadets out of the program. *Id.* at 28-29. Salvadore further testified that someone within the cadet program would definitely take orders from someone with some kind of rank. *Id.* at 32-33. "It was known that, you know, when we asked them to do something, they – it was – if they didn't they were disobeying a direct order." *Id.* at 33. When asked about not wanting to be alone with Richard, Salvadore stated, "There

have been times where individuals have said, you know, he's kind of inappropriate or whatever." *Id.* at 46.

8.      *Zachary Bridges*

Zachary Bridges ("Lt. Bridges") was promoted to lieutenant of recruitment within the Division of Fire in January of 2019. Bridges Dep., ECF No. 27 at 10. Richard was his supervisor and the battalion chief he reported to within the recruitment office. *Id*. at 17-19. Lt. Bridges testified that the recruitment office and cadet program were totally separate, less some informal dialogue recruitment would have with the cadets. *Id.* at 15. Testimony by others within the City conflicts with Lt. Bridges' claim, including testimony given by Richard. Richard testified that the cadet program was an "attachment" to the recruitment campaign and that the training bureau and recruitment worked together to develop a process of hiring and training the cadets. Richard Dep., ECF No. 34 at 17-18. Richard was also tasked to put together an application process for the cadet program, and he assigned duties to his staff within the recruitment office with respect to the cadet program. *Id.* at 20-22. Richard also testified he assisted with "tutoring, mentoring, coaching, counseling" the cadets. *Id.* at 22-23. Richard later testified that he had no decision-making regarding who stayed and went with respect to the cadets. *Id.* at 117.

Lt. Bridges, who again was part of recruitment, testified that he was part of the interview process with cadets, along with Farris and an HR representative, although he states he had no role in the decision process. Bridges Dep., ECF No. 27 at 59-60. Lt. Bridges stated that Richard's role was to assist in increasing overall diversity of the fire department. *Id.* at 16-17. The effort to increase diversity included an effort to recruit more female cadets. *Id.* at 20. He further states that Richard would speak with the cadets and was even present during the application process as a

speaker. *Id.* at 22-23. Additionally, he testified that Farris was asked to execute an RT-154 on Plaintiff with respect to Plaintiff's performance. *Id.* at 96-97.

As previously noted, female employees have testified that Lt. Bridges was aware of Richard's propensity to harass female employees of the City. While Lt. Bridges' position is that he did not have any notice prior to October of 2019, he also testified that he heard Richard make comments about women's bodies (*Id.* at 40-41); witnessed Richard looking women up and down and assessing their physique (*Id.* at 51-52); and heard comments from Richard that he found to be "Inappropriate from the standpoint that it could be a little flirtatious." (*Id.* at 93-94).

Lt. Bridges further conceded that people did tell him that they thought Richard was a little creepy. *Id.* at 27. He also states that Farris told him, prior to May 15, 2019, that she was uncomfortable around Richard. *Id.* at 33. Additionally, Farris and Dassylva told him, 30-60 days after Richard arrived to recruitment – in approximately December 2018 or January 2019 – that they did not like being alone with Richard. *Id.* at 35. They told Lt. Bridges that Richard said inappropriate things. *Id.* at 35-36. Lt. Bridges testified that he spoke to Richard about, amongst other things, that "They did not care for the qualifying of inappropriate statements." *Id.* at 37. Although Lt. Bridges testified that he did not tell Richard that women didn't like to be alone around him, he conceded that he told a representative of EEO, Ms. Bourke, that he did tell Richard women didn't want to be around him alone. *Id.* at 38-40. With respect to the unwritten rule with Farris and Richard, Lt. Bridges testified that the rule applied to all of them. *Id.* at 56.

Lt. Bridges testified that after the May 15, 2019 incident occurred with Plaintiff, Richard told him that Plaintiff had pulled her pants down in his office. Bridges Dep., ECF No. 38 at 18-19; Bridges Dep., ECF No. 27 at 81-83. This conversation occurred either on May 15, 2019 or the following day. Bridges Dep., ECF No. 27 at 44-45; Bridges Dep., ECF No. 38 at 18. Lt. Bridges

conceded that, if Plaintiff had stood up and pulled her pants down, he should have reported it (Bridges further states that Richard told him he stopped Plaintiff from pulling her pants down.) Bridges Dep., ECF No. 38 at 19-20.

After the investigation into Richard began, Lt. Bridges visited Farris at her house. Farris Dep., ECF No. 31 at 39-41; 66. Farris recorded the conversation. *Id.* In this conversation, he told her, "It's hell being down there" referring to the Division of Fire at Parsons Avenue. Bridges Dep., ECF No. 38 at 27-28. He also told her, "These guys are so remedial. Every single woman on the fire department has a legitimate harassment suit." (*Id.* at 49), though he later testified that he no longer stands by this statement. *Id.* He also disputes Farris' testimony that he apologized to her on multiple occasions, saying he only apologized to her once, and he did not apologize to her for not saying something sooner as, in his words, there was nothing to say sooner. *Id.* at 66-67.

## III.    Law and Argument

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs the standard for summary judgment. The Rule states "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the responsibility to identify the deficiencies in the other party's case that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden then shifts to the non-moving party to point to specific facts that show that there are indeed genuine issues of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

"Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, the court may not weigh the evidence to resolve factual disputes, determine credibility, nor choose which inferences to draw from the facts. *Id.* at 255. In resolving a summary judgment motion, the court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Id.* at 255, citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159 (1970). "A motion for summary judgment must be overruled if reasonable minds could find for the nonmovant." *Stephens v. A-Able Rents Co.*, 101 Ohio App.3d 20 (1995), citing *Saunders v. McFaul (1990), 716 Ohio App.3d 48, 593 N.E.2d 24*. "All factual doubts must be resolved in favor of the nonmovant." *Id.* citing *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138, 139-140.

Additionally, when the motivation of a defendant employer is at issue, summary judgment is rarely ever appropriate. *Ross v. Campell Soup Co.*, 237 F.3d 701, 705 (6th Cir. 2001). The summary judgment standard is a high standard.

### B.      Claims Pursuant to Title VII and R.C. 4112.02.

Plaintiff has provided ample evidence to provide a genuine dispute as to material facts with respect to her sexual harassment claims. Under both Ohio and federal law, it is illegal for an employer to discriminate against any individual with respect to employment due to an individual's sex. 42 U.S.C. Section 2000e-2(a)(1); Ohio Rev. Code Section 4112.02(A). The Sixth Circuit has noted that the requirements for establishing unlawful sex discrimination are the same under the Ohio statute and under 42 U.S.C. Section 2000(e)-2. *See Laderach v. U-Haul*, 207 F.3d 825, 828 (6th Cir. 2000). The statutes will, thus, be discussed as one.

For hostile work environment actions, the employee-plaintiff must prove that:

"(1) the employee is a member of a protected class; (2) the employee was subject to unwelcomed sexual harassment…; (3) the harassment complained of was based on sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or

offensive work environment…; and (5) *the existence of respondeat superior liability.*"

*Fleenor v. Hewitt Soap Co.*, 81 F.3d 48 (6th Cir. 1996), citing *Rabidue v. Osceola Refining, Co.*, 805 F.2d 611, 619-20 (6th Cir. 1986) (emphasis added), cert. denied, 481 U.S. 1041, 95 L. Ed. 2d 823, 107 S. Ct. 1983 (1987).

The City has only addressed the fifth element and claims that Plaintiff cannot establish a basis for employer liability. The first four elements, therefore, appear to not be in dispute. The evidence shows that, at the very least, a genuine issue as to material fact exists for employer liability.

The standard for employer liability with respect to sexual harassment claims turns on whether the harassment occurred at the hands of a supervisor or a co-worker. The City claims that Richard was not Plaintiff's supervisor and, therefore, the co-worker standard should apply. It is Plaintiff's position that Richard was, in fact, her supervisor, and that Plaintiff has provided sufficient evidence to create a genuine issue as to material fact with respect to employer liability. However, even if the Court found Richard to be a co-worker, Plaintiff has still created a genuine issue as to material fact with respect to employer liability.

1.    *Supervisor Harassment*

In *Vance v. Ball State University,* 570 U.S. 421 (2013), the Supreme Court held that an employee is a "supervisor" if the employer has empowered that employee "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

The City's position is that Richard was not Plaintiff's supervisor. However, a genuine issue as to material fact exists with respect to whether Richard was Plaintiff's supervisor. Richard

testified that he did have a role in establishing the application for cadets, and he further tasked individuals within the recruitment department to assist with the cadet program. Richard Dep., ECF No. 34 at 20-22. Reasonable minds could be led to the conclusion that the recruitment office, and Richard, had a role in the hiring process of the cadets. Richard also classified the cadet program as an "attachment" to the recruitment campaign (*Id.* at 17) which creates a genuine issue as to material fact with respect to whether the recruitment office was in a supervisory position over the cadet program. Richard further stated that he tutored and mentored cadets. *Id.* at 22-23.

While Richard testified that he did not have the power to discipline Plaintiff, if Plaintiff refused to meet with him, she would be subject to adverse consequences. *Id.* at 176-77; 184. Salvadore testified that she felt she had no choice but to comply with Richard's requests to pull cadets from the program to meet with him. Salvadore Dep., ECF No. 35 at 31-32. If a cadet refused to do something, in general, they could receive a verbal warning or even be written up. *Id.* at 32-33. In fact, Plaintiff's May 15, 2019 meeting with Richard and Lt. Towns resulted in her being written up. Jackson Dep., ECF No. 32 at 98. Moreover, Richard told her that other people wanted her out of the cadet program and that Richard was the only reason she was still there. *Id.* at 20-22. A genuine issue of material fact exists regarding whether Richard was Plaintiff's supervisor.

When harassment by a supervisor with authority over the employee culminates in a tangible employment action against the plaintiff, the employer is subject to vicarious liability and the analysis ends. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). When no tangible employment action was taken, but a hostile work environment was created, the employer may avail itself of an affirmative defense of liability. *Id.* To be successful on this defense, an employer must establish two elements by a preponderance of the evidence: first, that the employer exercised reasonable care to prevent and correct properly any sexually harassing behavior, and second, that

the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

"Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy." *Thornton v. Fed Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008). An effective harassment policy should do or include the following: 1) require supervisors to report sexual harassment; 2) permit complaints, whether formal or informal; 3) provide a means for bypassing a harassing supervisor when generating a complaint; and 4) provide for training regarding the sexual harassment policy. *Clark v. UPS*, 400 F.3d 341, 349-50 (6th Cir. 2005). With respect to the second element of the affirmative defense, a demonstration of *unreasonable* failure to use a complaint procedure provided by an employer normally serves to satisfy an employer's burden. *Faragher*, 524 U.S. 775 at 807-08 (emphasis added).

The City claims that it exercised reasonable care to prevent and correct any sexually harassing behavior. However, the evidence demonstrates a genuine issue as to material fact regarding whether the City had an effective sexual harassment policy and whether it enforced their sexual harassment policy. Richard testified he did not believe the sexual harassment training was adequate. Richard Dep., ECF No. 34 at 14. Farris' complaints to Lt. Bridges are arguably informal complaints that Lt. Bridges did not report, thus showing that the City did not enforce its' own policy. The City further states that Plaintiff was aware of the sexual harassment policy but still waited more than four months to report Richard. However, the decision in *Faragher* notes that an *unreasonable* failure to use any complaint procedure normally suffices to satisfy the employer's burden. For the reasons set forth below, it is apparent that Plaintiff's failure to report Richard was not unreasonable.

Richard had been employed with the City for 35 years. Jackson Dep., ECF No. 32 at 28; Richard Dep., ECF No. 34 at 9. Richard's first instance of harassment began before Plaintiff had even started her employment with the City with the cadet program. Richard also made statements to Plaintiff along the lines of "you're only here because of me" (Jackson Dep., ECF No. 32 at 22; 56); Who are they going to believe? Me or you?" (*Id.* at 222-23), and "…what are you going to do in return? Like in reparation for me keeping you here?" *Id.* at 22. Plaintiff has testified that she was not trying to stir anything up (*Id.* at 39), and that if she reported Richard, she believed staff was going to think she was making an excuse. *Id.* at 40. She was also told by Richard that he had been given full control over her (*Id.* at 41).

Additionally, given that Richard held a high position within the paramilitary chain of command, it is not reasonable to expect Plaintiff to utilize the complaint procedures set forth in the City's harassment policy. In fact, on the day the program started, the chiefs told the cadets that they "…had to do whatever we given an order…" *Id.* at 87. Plaintiff further testified that "…the man intimidated me. He's put fear inside of me. He's induced panic inside of me. He has me thinking that he's the only chance of hope of me holding onto my job and being able to feed my kids." *Id.* at 226-27. Again, someone within the cadet program would take orders from someone with some kind of rank. Salvadore Dep., ECF No. 35 at 32-33. "It was known that, you know, when we asked them to do something, they – it was – if they didn't they were disobeying a direct order." *Id.* at 33. Richard himself testified that an individual with lower rank had to comply with an order given by someone with a higher rank. Richard Dep., ECF No. 34 at 46-47. Lt. Bridges also conceded that it would not be uncommon or unexpected for a cadet to be intimidated by the battalion chief. Bridges Dep., ECF No. 27 at 83. Plaintiff's failure to report was not unreasonable.

*2.     Co-Worker Harassment*

If the Court finds that Richard was not Plaintiff's supervisor, Plaintiff is still able to create

a genuine issue of material fact for employer liability under the co-worker harassment standard.

An employer is liable under this theory if the employer was "negligent with respect to this

offensive behavior." *Vance,* 570 U.S. at 427 (2013), citing *Faragher*, 524 U.S. at 789, 118 S. Ct.

2275, 141 L. Ed. 2d 662. Negligence is defined as a response that "manifests indifference or

unreasonableness in light of the facts the employer knew or should have known." *Hawkins v.*

*Anheuser-Busch, Inc.* 517 F.3d 321, 338 (6th Cir. 2008). In assessing this negligence, the Court in

*Vance* determined that the "nature and degree of authority wielded by the harasser" is an important

factor in determining whether an employer was negligent. *Vance*, 570 U.S. at 445-46.

With respect to serial harassers, "An employer's responsibility to prevent future

harassment is heightened where it is dealing with a known serial harasser and is therefore on clear

notice that the same employee has engaged in inappropriate behavior in the past." *Hawkins,* 517

F.3d at 341. "The best anti-discrimination policy in the world will not help the employer who,

rather than fulfill its duty to act on complaints about a serial harasser, lets the known harasser

continue to injure new victims." *Id.*, citing Elizabeth Jubin-Fujiwara & Joyce M. Brown, *Causes*

*of Action for Post-Ellerth/Faragher Title VII Employment Sexual Harassment Claims*, § 53,

(2008), available at 27 COA2d 1 (Westlaw).

The evidence set forth demonstrates that Richard was a known serial harasser prior to

Plaintiff's enrollment with the cadet program and even during her enrollment. Furthermore, Lt.

Bridges had actual notice from Richard himself with respect to portions of the May 15, 2019

incident (*see* Bridges Dep., ECF No. 38 at 18-19; Bridges Dep., ECF No. 27 at 81-83); the

harassment of Plaintiff continued after this incident occurred. Additionally, as battalion chief, and

within the paramilitary structure of the fire department, Richard held a high degree of authority over Plaintiff. The testimony set forth clearly demonstrates a manifest indifference and unreasonableness in light of the facts the City knew or, at the very least, should have known regarding Richard's propensity to harass female employees.

The City claims its response was adequate, yet the City had notice of Richard's harassment in as early as January or February of 2019. Additionally, after the October instances of Farris and Diehm were reported, the City initially only removed Richard from the Office of Recruitment. The City states, "By the time Plaintiff made her initial harassment allegation on October 7, Richard never worked another day on site for the City. Once Jackson alleged sexual assault, Richard was placed on administrative leave." Motion for Summary Judgment, ECF No. 19 at 5. However, Plaintiff testified that she was told the City was just going to move Richard to another location. *See* Jackson Dep., ECF No. 32 at 106-07. Richard testified, "…they had told me there was some allegations and that I would be placed on administrative leave until, I believe, Ms. Bourke or someone, was able to further investigate the allegations and that I would be placed on – back out on company." Richard Dep., ECF No. 34 at 122.

"A company faced with a pattern of harassment must both respond appropriately and take increasingly effective steps designed to end the harassment. The failure to do so suggest indifference and permissiveness on the part of management." *Hawkins*, 517 F.3d at 344. As in *Hawkins*, Plaintiff has raised a genuine issue of material fact as to whether the City took adequate measures in this case and, therefore, summary judgment must fail. *See Id.*

### C.    Negligent Supervision and Retention

Evidence demonstrates a genuine issue of material fact with respect to the negligent supervision and retention claim. To prove this type of claim, a plaintiff must demonstrate: "(1) the

existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Evans v. Ohio State Univ.,* 112 Ohio App.3d 724, 739, (1996). Each element is addressed in turn below.

### 1. Existence of an Employment Relationship

There is seemingly no dispute that Richard was employed by the City at all times relevant hereto. *See* Motion for Summary Judgment, ECF No. 19 at 2.

### 2. Employee's Incompetence

Incompetence can be shown in multiple ways, including an employee's sexually harassing behavior. *See Fry v. Wheatland Tube*, LLC, 2019-Ohio-1453, at ¶ 91 (5th Dist. 2019) ("[B]ehavior while on the job inapposite to the task that a job involves and which materially inhibits other employees from performing their assigned job tasks [is incompetent]. Sexually harassing behavior is within that definition.").

Evidence shows that Plaintiff was sexually harassed, and sexually assaulted, by Richard. Additionally, the testimony of the other victims set forth in the Statement of Facts shows a history of sexual harassment by Richard, further demonstrating Richard's incompetence.

### 3. Employer's Actual or Constructive Knowledge of Incompetence

The distinction between actual and constructive knowledge hinges on the "manner in which notice is obtained or assumed to have been obtained rather than in the amount of information obtained." *White v. Ohio Dept. of Rehab. And Corr.*, 2005-Ohio-5063, ¶ 40 (Ohio Ct. Cl., Dec. 22, 2005). In *White*, the Court explained that actual knowledge is found where "the information was personally communicated to or received by the party." *Id.* This information can either be direct or

implied (i.e. "person had means of knowledge which he did not use.") *Id.* Alternatively, constructive knowledge is "that which the law regards as sufficient to give notice." *Id.* Further, employer ignorance towards a problem can be deemed willful blindness. "At least one court has applied that concept in a civil context and defined the term as the 'conscious tort of deliberate ignorance that's meant to be imposed when a defendant refuses to take basic investigatory steps." *Id.* at ¶ 44 (citing *Childs v. Charske*, 129 Ohio Misc.2d 50, 57, 822 N.E.2d 853, 2004-Ohio-7331).

The City claims it did not know Richard was sexually harassing employees until the reports of Farris and Diehm. Motion for Summary Judgment, ECF No. 19 at 10. However, the evidence demonstrates a genuine dispute as to knowledge prior to these reports. For example, both Farris and Diehm had discussed harassing behaviors with Lt. Bridges in early as January or February of 2019. Moreover, others within the City were harassed by Richard, and some told other employees within the City, showing actual knowledge on the part of a number of other individuals. One employee within the human resources department, Fannin, was even harassed. Fannin even explicitly told Richard "…comments like this could be considered harassment." Fannin Dep., ECF No. 30 at 22-23. Fannin relayed her conversation to a lieutenant shortly after it occurred. *Id.* at 21.

If the Court were to find no actual notice, at the very least, based on the above, there is constructive notice of Richard's incompetency. Those within the City tended to brush off actions and statements of Richard, thus demonstrating willful blindness. *See*, for example, Farris Dep., ECF No. 31 at 38 (When discussing Richard's request that every woman brought through the requirement doors should be brought to his office before they leave with Ruffin, Farris stated this was inappropriate, and Ruffin responded with, "Well, he's the fire chief.").

4. *Employee's Act or Omission Causing Plaintiff's Injury*

Richard's sexual harassment and assault caused injury to Plaintiff. Per Dr. Bob Stinson, a board-certified forensic psychologist, Plaintiff suffers from PTSD and major depressive order as a direct and proximate cause of the sexual harassment and assault. *See* Exhibit 1, Affidavit of Bob Stinson. Dr. Stinson further notes that Plaintiff was "reportedly well-adjusted with minimal social and emotional problems despite a significant trauma history" prior to being sexually harassed and assaulted by Richard. *Id.* Plaintiff also underwent counseling with EAP through the City following the harassment and assault of Richard. Jackson Dep., ECF No. 32 at 116-17; 219-20. Plaintiff stated that the EAP counselor told her that her problems sounded like PTSD, anxiety, and depression. *Id.* at 116.

5. *Employer's Negligence in Hiring or Retaining Employee was Proximate Cause of Plaintiff's Injury*

The City's negligence in hiring and retaining Richard as a member of the Columbus Division of Fire proximately caused Plaintiff's injuries. Plaintiff has testified that she thought Richard had authority over her (*Id.* at 59); she was told people wanted her out of the cadet program and he had kept her there (*Id.* at 20-22); and if she wasn't compliant with Richard she was going to get fired. *Id.* at 23. But for Richard's employment with the City, there is no evidence Plaintiff would have ever met Richard and, therefore, the harassment and assault never would have happened. *See Stephens*, 101 Ohio App.3d at 27 ("Had Taylor not been an employee, this attack would not have happened.").

6. *Sexual Assault*

With respect to the criminal acts of Richard, specifically, the sexual assault, the City's liability depends on foreseeability. *Evans*, 112 Ohio App.3d at 740. The test is set forth as follows: "'Whether a reasonably prudent person would have anticipated that an injury was likely to result

from the performance or nonperformance of an act.'" *Id.*, citing *Federal Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 173-174, 543 N.E.2d 769.

> Concerning criminal acts of a third party which the defendant might reasonably anticipate, "the mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the reasonability upon the defendant." *Prosser & Keeton, supra,* at 305. Rather, "it is only where misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed." *Id.* at 313.

"The foreseeability of a criminal act depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances...It is when the totality of the circumstances is 'somewhat overwhelming' that a defendant will be held liable." *Simpkins v. Grace Brethren Church of Del.*, 2014-Ohio-3465, ¶ 35 (5th Dist. 2014), citing *March v. Steed Enterprises, Inc.* 5th Dist. Muskingum No. CT2012-0058, 2013-Ohio-4448. "[W]here an employer knows or has reason to know that one of his employees is sexually harassing other employees, he may not sit idly by and do nothing." *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486 (1991).

Sitting idly by and doing nothing is exactly what the City chose to do. Evidence has shown that Richard harassed numerous women within the City, all within a relatively short period of time. The totality of the circumstances is overwhelming. It is foreseeable that Richard's misconduct would escalate, and, subsequently, the criminal misconduct of Richard could have been anticipated.

### D. <u>Respondeat Superior</u>

Plaintiff has established a genuine issue as to material fact with respect to the claim for respondeat superior. An employer may be held liable for the negligent conduct of an employee acting within the scope of his employment. *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584 (1991); *Lipps v. Kash*, 2008-Ohio-2628, ¶ 8 (12th Dist. 2008). "In a summary judgment proceeding, whether an employee is within the scope of his employment is *generally* a question of

fact to be decided by the jury." *Id.*, citing *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825 (1993). This issue only becomes a question of law when the facts are undisputed and reasonable minds can only come to one conclusion. *Id.*

Employers are not liable for "independent, self-serving acts of employees that, in no way, facilitate or promote the employer's business." *Patidar v. Tri-State Renovations, Inc.*, 10th Dist. No. 06AP-212, 2006-Ohio-4631, ¶ 9 (10th Dist. 2006). While an intentional tort such as sexual assault may be "so far outside the scope of employment that employers should not be held liable for such acts under the doctrine of respondeat superior or vicarious liability" (*Simpkins.,* 2014-Ohio-3465, at ¶ 50), "[t]he willful and malicious character of an employee's act does not always, as a matter of law, remove the act from the scope of the employment, unless the act is so divergent that its very character severs the employment relationship." *Stephens,* 101 Ohio App.3d at 30.

This case presents similarities to *Osborne v. Lyles*. In the *Osborne* case, the Ohio Supreme Court decided that "an off-duty police officer, who assaults someone while in the course of securing the scene of an accident, and represents that he is making an arrest, is not only acting within the scope of his employment, but is also facilitating or promoting his employer's business." *Stephens*, 101 Ohio App.3d at 30, citing *Osborne*, 63 Ohio St.3d at 334, 587 N.E.3d at 832. This case is similarly analogous to *Mary M. v. Los Angeles* (1991), 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341, where the California Supreme Court found that a police offer who raped a drunk driver instead of arresting her was within the scope of his employment. *Stephens*, 101 Ohio App.3d at 30. "The question of fact standards of Osborne and Mary M. are limited to situations involving police officers who take advantage of their authority and control and abuse their power." *Id.*

Despite the City's claim that Richard's actions were not committed within the course of his employment, reasonable minds could find that Richard was acting within the scope of his

employment. While Richard did sexually assault Plaintiff, this was not the only misconduct Plaintiff suffered at the hands of Richard. As previously set forth, Richard also sexually harassed Plaintiff between February or March of 2019 and October of 2019, both on the fire campus and off. Furthermore, Richard's actions were always under the guise of helping Plaintiff stay in the cadet program, as evidenced by the statements he made to both Plaintiff and Thomas. Additionally, while Richard was not a police officer, he operated under a paramilitary culture where he wielded a significant amount of authority over Plaintiff, including having the ability to pull Plaintiff out of the program, and he subsequently used this authority to abuse his power. It cannot be said that Richard was neither facilitating nor promoting the City. Whether the facts support the City's argument is an issue for the jury to resolve. *See Auer v. Paliath*, 140 Ohio St.3d 276, 281 (2014). Summary judgment is improper and must be denied.

### E. **Intentional Infliction of Emotional Distress**

To prove a claim for intentional infliction of emotional distress, a plaintiff must show: 1) defendant intended to cause emotional distress or knew or should have known that its actions would result in serious emotional distress; 2) defendant's conduct was so extreme and outrageous as to go beyond all bounds of decency and is considered as utterly intolerable in a civilized community; 3) defendant's actions were the proximate cause of plaintiff's injuries; and 4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it." *Osborne v. Douglas,* 2013-Ohio-5072, ¶ 52 (6th Dist. 2013). The Ohio Supreme Court has stated that severe emotional distress is an "emotional injury which is both severe and debilitating" that "may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983).

Plaintiff reincorporates the arguments hereto set forth in Sections 3(B) and 3(D) as evidence why liability accrues on the City for intentional infliction of emotional distress. The City does not seem to refute that Plaintiff experienced sexual harassment. "Sexual harassment on the job is undoubtedly an intentional infliction of emotional distress." *Johnson v. Cox*, 1997 Ohio App. LEXIS 1346 at *11 (4th Dist. 1997). All relevant evidence presented in support of sexual harassment is also relevant and admissible with respect to intentional infliction of emotional distress. *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 740 (2000).

The City knew of Richard's propensity to harass women within the City prior to Plaintiff enrolling in and while in the cadet program, yet the City chose to ignore and turn a blind eye to Richard's actions. This willful blindness is extreme and outrageous. At a minimum, whether the conduct was so extreme and outrageous as to go beyond all possible bounds of decency is a factual intensive inquiry best left to the jury and should not be decided on summary judgment. *See Morningstar v. Circleville Fire & EMS Dep't,* 2018 U.S. Dist. LEXIS 43134 at *56-57 (S.D. Ohio Mar. 16, 2018). The City should have known that the failure to remove Richard would result in mental anguish to other women within the City. If the City would have removed Richard from his position with the fire department prior to Plaintiff becoming a Cadet, she never would have underwent the sexual assault and harassment. Therefore, the City's actions – or inactions – were a proximate cause of Plaintiff's resulting injuries. The assault and harassment experienced by Plaintiff cannot be said to be a mere insult, indignities, threat, annoyance, petty oppression or other trivial act. Finally, the resulting harm Plaintiff experienced, as set forth in Section 3(C)(4), rises to a level of serious mental anguish that no one should have to endure. Plaintiff has established a genuine dispute as to material facts with respect to her claim for intentional infliction of emotional distress, and summary judgment must be denied.

### F.     Negligent Infliction of Emotional Distress

Plaintiff is not pursuing a claim for negligent infliction of emotional distress against the City and hereby withdraws any such claim.

## IV.     Conclusion

For the reasons set forth above, the City cannot meet the high summary judgment burden with respect to any of the claims brought against it. The Plaintiff respectfully moves the Court for an Order denying the Motion for Summary Judgment on all claims.

Respectfully submitted,

/s/ Kirstin A. Peterson
Kirstin A. Peterson (0099040)
John K. Fitch (0008119)
The Fitch Law Firm, LLC
900 Michigan Avenue
Columbus, OH 43215
614.545.3930; 614.545.3929 – Fax
Kirstin@thefitchlawfirm.com
John@thefitchlawfirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was sent to all counsel of record via the Court's electronic filing system on this 2nd day of December, 2021.

/s/ Kirstin A. Peterson
Kirstin A. Peterson (0099040)
John K. Fitch (0008119)